IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JESUS BROWN,<br><br>    Plaintiff,<br><br>  vs.<br><br>DR. DEOL, Nebraska Department of Correctional Services Medical Director, individually and in their official capacities; GARY J. HUSTAD, MD, individually and in their official capacities; DAN DANAHER, Physician Assistant, individually and in their official capacities; and DR. JEFFREY KASSELMAN, in his individual and official capacity;<br><br>    Defendants. | **4:18CV3020**<br><br><br>**MEMORANDUM<br>AND ORDER** |

This matter is before the court on Defendants' Motion for Summary Judgment. (Filing No. 42.) For the reasons that follow, the Motion is granted.

## I. BACKGROUND

Plaintiff, an inmate in the custody of the Nebraska Department of Correctional Services ("NDCS") and currently confined at the Lincoln Correctional Center ("LCC"), brings this 42 U.S.C. § 1983 action against Defendants Dr. Deol, the NDCS Medical Director; Gary J. Hustad, M.D., a doctor responsible for NDCS inmates housed at LCC and the Diagnostic & Evaluation Center ("DEC"); Dr. Jeffrey Kasselman, the pain specialist for the NDCS; and Physician Assistant ("P.A.") Dan Danaher. (Filing No. 1 & Filing No. 21.) Plaintiff claims that

Defendants have failed to provide him medical treatment in violation of the Eighth Amendment. (Filing No. 1 & Filing No. 21.)

Plaintiff alleges that he entered NDCS custody with an existing back injury from a car accident for which he had been receiving treatment. Upon admission at the DEC, Plaintiff informed NDCS medical staff of his back injury and pain, as well as medical issues with his neck, feet, hand, elbow, shoulder, and knee. Plaintiff asserts that his medical conditions are documented in his medical records, in MRIs, and by specialists, and that Defendants are "well aware of the plaintiff's medical issues and still wish to not treat him for them as they should be." (Filing No. 1 at CM/ECF p. 3.) More specifically, Plaintiff complains that he was given Gabapentin for his pain issues, rather than Lyrica as was recommended by another doctor (Filing No. 1-1 at CM/ECF pp. 3, 14), and that his prescription pain medication eventually was tapered off, and then discontinued, "even though the[re] is written documentation and [a] specialist that say[s] he needs pain medication." (Filing No. 1 at CM/ECF p. 3; Filing No. 1-1 at CM/ECF p. 8. In a supplement, Plaintiff indicates that he has been put back on Gabapentin as of July 31, 2018 but maintains that he is still in extreme pain and medical is refusing to provide necessary medical treatment. (Filing No. 15 at CM/ECF pp. 1, 86–91.)

With respect to Dr. Hustad and P.A. Danaher, Plaintiff alleges that they both were responsible for the medical care of inmates housed at the LCC. (Filing No. 1 at CM/ECF p. 2.) Plaintiff alleges that both Dr. Hustad and P.A. Danaher were aware of Plaintiff's medical needs, his complaints of extreme pain, and that outside prison doctors had ordered certain treatments and medications. Despite this knowledge, they refused to administer Plaintiff the necessary treatments and medications recommended by Plaintiff's outside physicians. Specifically, Plaintiff alleges that one specialist "even recommended a stronger pain medication and P.A. Danaher refused to give this medication to [Plaintiff] and ordered a less stronger medication for his pain so as [Plaintiff] had to suffer in pain." (Filing No. 1 at CM/ECF p. 3.) Further, Plaintiff alleges "P.A. Danaher also told the Plaintiff that because he complained so much about being in pain [P.A. Danaher] did not believe that he was

in pain and took him off all of his pain medication even though the[re] is written documentation and [a] specialist that say he needs pain medication." (Filing No. 1 at CM/ECF p. 3.) Plaintiff alleges that Dr. Hustad oversees P.A. Danaher and knew of Plaintiff's medical needs but failed to ensure Plaintiff received the treatment he needs. The Inmate Interview Requests ("IIRs") attached to Plaintiff's Complaint show that Dr. Hustad consulted with P.A. Danaher about Plaintiff's medical complaints and personally responded to some of Plaintiff's IIRs about his medical issues. (Filing No. 1-1 at CM/ECF pp. 11, 13-14.)

Regarding Dr. Kasselman, Plaintiff alleges that he is the pain specialist for the NDCS who "agreed to remove [Plaintiff] off his medication, even when he was in serious pain." (Filing No. 21 at CM/ECF pp. 1, 3, ¶¶ 4, 20.)

Plaintiff further alleges that Dr. Deol, the NDCS Medical Director, was deliberately indifferent to Plaintiff's medical needs and "knew or should have known" about Plaintiff's medical needs and lack of treatment because "he oversees all of the Department of Medical and is the one whom approves all Medical procedures and treatments being done to any prison inmate . . . and is the one whom told all his staff to make cuts in spending and to stop treating some things." (Filing No. 1 at CM/ECF p. 5; Filing No. 21 at CM/ECF p. 5, ¶ 28.)

As relief for the Defendants' alleged deliberate indifference to Plaintiff's medical needs, Plaintiff seeks declaratory and injunctive relief, $500,000.00 in compensatory damages, and $500,000.00 in punitive damages against each Defendant.[1] (Filing No. 1 at CM/ECF p. 5; Filing No. 21 at CM/ECF pp. 5-6.)

---

[1] The court previously determined that this action could proceed to service of process as to Plaintiff's Eighth Amendment claims against Defendants in their individual capacities, as well as in their official capacities for prospective injunctive relief only. (Filing No. 16 at CM/ECF p. 15; Filing No. 28 at CM/ECF p. 4.)

Defendants filed their Motion for Summary Judgment on July 8, 2019. (Filing No. 42.) Along with their Motion, Defendants filed a Brief in Support and an Index of Evidence. (Filing No. 43 & Filing No. 43.) Plaintiff did not file a response to Defendants' Motion.

Plaintiff, a pro se litigant, is "bound by and must comply with all local and federal procedural rules." NEGenR 1.3(g). The court's local rules require the party moving for summary judgment to file a brief containing a "separate statement of material facts about which the moving party contends there is no genuine issue to be tried and that entitles the moving party to judgment as a matter of law." This statement of facts "should consist of short numbered paragraphs, each containing pinpoint references to . . . materials that support the material facts . . . ." NECivR 56.1(a). The opposing party must respond to the moving party's statement of material facts in a brief containing separate numbered paragraphs with citations to supporting references and with identification of material facts that are disputed. NECivR 56.1(b). *See also* NECivR 7.1(b)(2)(A) ("When filing the opposing brief, the opposing party must also file and serve supporting evidentiary material not previously filed."). Properly referenced material facts in the movant's statement of facts are "considered admitted unless controverted in the opposing party's response." NECivR 56.1(b)(1).

The court has carefully reviewed the documents submitted by Defendants. While Defendants have submitted a statement of material facts in accordance with the court's rules, Plaintiff has not filed any response to Defendants' Motion for Summary Judgment.[2] Further, Defendants submitted evidence which was properly authenticated by medical records and declarations. In light of this, the court adopts

---

[2] The court does consider the facts alleged in Plaintiff's verified Complaint and attached exhibits, Plaintiff's Amended Complaint, and Plaintiff's Supplement and attached exhibits. *See Roberson v. Hayti Police Dep't*, 241 F.3d 992, 994-95 (8th Cir. 2001) ("The facts alleged in a verified complaint need not be repeated in a responsive affidavit in order to survive a summary judgment motion.") (citations omitted).

the following undisputed material facts, which are largely taken from Defendants'
submission.

## II. UNDISPUTED MATERIAL FACTS

1. On March 27, 2014, Plaintiff was seen by medical staff at the DEC in
Lincoln, Nebraska, with complaints of mid-back pain. (Filing No. 43-1 at CM/ECF
p. 1.) Records from Plaintiff's previous emergency room visit indicated a T11 wedge
compression fracture that was "fairly mild." (Filing No. 43-1 at CM/ECF p. 1.)
Plaintiff's cervical spine CT was completely negative. (Filing No. 43-1 at CM/ECF
p. 1.) Physician Assistant ("P.A.") Cheryl Flinn continued to prescribe Plaintiff
Tramadol and prescribed Plaintiff Ibuprofen 800 mg "to take in between" as needed
and Flexeril 10 mg to try for the next couple of months. (Filing No. 43-1 at CM/ECF
p. 1.) Plaintiff acknowledged he would not be prescribed Flexeril forever. (Filing
No. 43-1 at CM/ECF p. 1.)

2. On April 15, 2014, Plaintiff was seen by Dr. Christina-Lynn Ferguson
complaining of back pain from a car accident in 2013. (Filing No. 43-1 at CM/ECF
pp. 2, 28.) Dr. Ferguson noted Plaintiff would be scheduled for an X-ray of his
thoracic and lumbar spine. (Filing No. 43-1 at CM/ECF p. 2.) Dr. Ferguson
explained she would schedule Plaintiff for removal of glass from his left forearm as
well. (Filing No. 43-1 at CM/ECF p. 2.)

3. On April 18, 2014, Plaintiff received an X-ray of his lumbar and
thoracic spine. (Filing No. 43-1 at CM/ECF pp. 3-4.) No acute osseous or alignment
abnormality was observed on Plaintiff's lumbar spine. (Filing No. 43-1 at CM/ECF
p. 3.) With respect to Plaintiff's thoracic spine, the X-ray indicated "T11 age-
indeterminate wedge compression deformity with approximately 30% loss of
height" but no fractures, dislocations, or alignment abnormality. (Filing No. 43-1 at
CM/ECF p. 4.)

4. On May 16, 2014, Plaintiff underwent a procedure in which glass was removed from his forearm. (Filing No. 43-1 at CM/ECF p. 5.)

5. On May 23, 2014, Plaintiff received a lower-bunk pass for 30 days. (Filing No. 43-1 at CM/ECF p. 6.)

6. On June 5, 2014, Plaintiff was seen by Dr. Christina-Lynn Ferguson regarding his chronic back pain. (Filing No. 43-1 at CM/ECF p. 7.) Dr. Ferguson discussed with Plaintiff that Flexeril should be limited to short periods of time. (Filing No. 43-1 at CM/ECF p. 7.) Plaintiff was prescribed Methocarbamol 750 mg for back spasms. (Filing No. 43-1 at CM/ECF p. 7.)

7. On August 7, 2014, medical saw Plaintiff regarding pain in his right hand. (Filing No. 43-1 at CM/ECF p. 8.) The next day, on August 8, 2014, Plaintiff had an X-ray of that hand. (Filing No. 43-1 at CM/ECF p. 8.)

8. On October 16, 2014, Plaintiff received a lower-bunk pass for 90 days. (Filing No. 43-1 at CM/ECF p. 9.)

9. On October 18, 2014, Plaintiff requested a refill of his Methocarbamol prescription for his back pain. (Filing No. 43-1 at CM/ECF p. 11.) It was refilled three days later. (Filing No. 43-1 at CM/ECF p. 11.)

10. On October 20, 2014, Plaintiff received a lower-bunk pass for twelve months. (Filing No. 43-1 at CM/ECF p. 10.)

11. Upon referral, Plaintiff saw an orthopedic specialist on November 3, 2014 for his hand pain. (Filing No. 43-1 at CM/ECF p. 12.) X-rays indicated post-traumatic arthritis, secondary to closed fist injuries. (Filing No. 43-1 at CM/ECF p. 12.) The orthopedic specialist, Dr. Scott Strasburger, had no recommendations for treatment. (Filing No. 43-1 at CM/ECF p. 12.)

12.    On November 19, 2014, Plaintiff was seen by medical for back and foot pain. (Filing No. 43-1 at CM/ECF p. 14.) Medical continued Plaintiff's prescription for Tramadol and Ibuprofen 800 mg as needed. (Filing No. 43-1 at CM/ECF p. 14.)

13.    On November 19, 2014, Plaintiff was given a medical-equipment pass for orthotic arches. (Filing No. 43-1 at CM/ECF p. 15.)

14.    On December 22, 2014, after reporting that the outside orthopedist said surgery would not help Plaintiff's wrist, medical requested (and it was approved) up to six visits for physical therapy for Plaintiff's right hand/wrist. (Filing No. 43-1 at CM/ECF p. 13.)

15.    On December 22, 2014, Plaintiff was given a medical-equipment pass for a brace/splint for carpal tunnel. (Filing No. 43-1 at CM/ECF p. 16.)

16.    On December 24, 2014, Plaintiff met with medical and discussed his right wrist pain and how they would proceed with physical therapy to work on strengthening his grip and increasing his range of motion. (Filing No. 43-1 at CM/ECF p. 17.) Medical also ordered fish oil 1000 mg for joint pain. (Filing No. 43-1 at CM/ECF p. 17.)

17.    On January 8, 2015, and January 22, 2015, Plaintiff did not show up for his scheduled physical therapy appointments. (Filing No. 43-1 at CM/ECF pp. 18-19.)

18.    On February 3, 2015, Plaintiff met with P.A. Cameron Eklund to discuss his neck and hand pain. (Filing No. 43-1 at CM/ECF p. 20.) P.A. Eklund prescribed a cervical pillow for six months, a cock-up wrist splint to sleep in, and continued physical therapy. (Filing No. 43-1 at CM/ECF p. 20.)

19.    On February 12, 2015, Plaintiff met with Dr. Ferguson complaining of back pain. (Filing No. 43-1 at CM/ECF pp. 20-21.) Dr. Ferguson advised Plaintiff

to continue taking Tramadol for back and hand pain, continue using wrist splint, and was prescribed 300 mg Gabapentin to use in the mornings for back pain. (Filing No. 43-1 at CM/ECF p. 21.)

20.     On March 25, 2015, Plaintiff received a medical equipment pass for arch insoles. (Filing No. 43-1 at CM/ECF p. 22.)

21.     On April 3, 2015, medical ordered, and Plaintiff received, an X-ray on his elbow. (Filing No. 43-1 at CM/ECF p. 23.)

22.     On April 27, 2015, Plaintiff failed to attend his scheduled appointment. (Filing No. 43-1 at CM/ECF p. 24.)

23.     On May 8, 2015, Plaintiff failed to attend his scheduled appointment. (Filing No. 43-1 at CM/ECF p. 24.)

24.     On May 27, 2015, Plaintiff met with APRN Julie Pew with complaints of hand and knee pain. (Filing No. 43-1 at CM/ECF p. 24.) APRN Pew noted Plaintiff was already taking Tramadol 50 mg three times per day, Gabapentin 300 mg in the morning, and Methocarbamol 750 mg two times per day. (Filing No. 43-1 at CM/ECF p. 24.) APRN Pew added Naproxen 500 mg twice per day as needed for hand and knee pain with one refill. (Filing No. 43-1 at CM/ECF p. 24.) Additionally, APRN Pew ordered an X-ray of his knee. (Filing No. 43-1 at CM/ECF p. 24.)

25.     On May 29, 2015, Plaintiff received an X-ray of his knee. (Filing No. 43-1 at CM/ECF p. 25.)

26.     On or around the summer of 2015, Plaintiff was released from prison and released into the community. (Filing No. 43-1 at CM/ECF pp. 26, 95.)

27.     On or about October 22, 2015, Plaintiff was back within NDCS custody and complained of back pain in an IIR. (Filing No. 43-1 at CM/ECF p. 27.) The next day, NDCS staff informed Plaintiff he should start receiving Tramadol, Flexeril, and Gabapentin that day. (Filing No. 43-1 at CM/ECF p. 27.)

28.     On October 27, 2015, Plaintiff met with medical to address complaints of back pain. (Filing No. 43-1 at CM/ECF p. 28.) Plaintiff complained his Tramadol 50 mg twice per day was not helping and that he was not receiving Flexeril. (Filing No. 43-1 at CM/ECF p. 28.) P.A. Jennifer Biestek informed Plaintiff that "Cyclobenzaprine," which he had been receiving, was, in fact, Flexeril. (Filing No. 43-1 at CM/ECF p. 28.) P.A. Biestek noted in Plaintiff's medical file that he had a history of drug abuse (methamphetamines, cocaine, and marijuana) per his intake physical. (Filing No. 43-1 at CM/ECF p. 28.) P.A. Biestek declined to increase Plaintiff's Tramadol because she did not believe there was enough medical documentation of necessity based on MRI findings. (Filing No. 43-1 at CM/ECF p. 28.) Defendant Dr. Hustad agreed with P.A. Biestek's treatment plan. (Filing No. 43-1 at CM/ECF p. 28.)

29.     On October 29, 2015, Plaintiff received a lower-bunk pass for 365 days. (Filing No. 43-1 at CM/ECF p. 29.)

30.     On November 2, 2015, Plaintiff met with P.A. Flinn complaining of wrist, hand, and back pain. (Filing No. 43-1 at CM/ECF p. 30.) Plaintiff believed that there was some sort of surgery to fix the problems. (Filing No. 43-1 at CM/ECF p. 30.) P.A. Flinn informed him surgery is not done with compression fractures. Filing No. 43-1 at CM/ECF p. 30.) P.A. Flinn ordered an X-ray of Plaintiff's hand and wrist and restricted Plaintiff from weightlifting or playing basketball. (Filing No. 43-1 at CM/ECF p. 30.) Plaintiff said he did not lift weights, but P.A. Flinn noted that his physique suggested otherwise. (Filing No. 43-1 at CM/ECF p. 30.)

31.     On November 2, 2015, Plaintiff was approved for a physical therapy consultation. (Filing No. 43-1 at CM/ECF p. 30.)

32.     On November 3, 2015, Plaintiff received an X-ray of his right wrist and hand. (Filing No. 43-1 at CM/ECF p. 31.) No evidence of an acute fracture or dislocation in the hand was observed. (Filing No. 43-1 at CM/ECF p. 31.)

33.     On November 5, 2015, Plaintiff received a physical therapy evaluation and approval for six sessions. (Filing No. 43-1 at CM/ECF p. 32.)

34.     On November 19, 2015, Dr. Hustad saw Plaintiff because of "ongoing complaints of inadequate management of chronic mid back pain." (Filing No. 43-1 at CM/ECF p. 33.) After discussion with, and examination of, Plaintiff, Dr. Hustad ordered Plaintiff's Naproxen discontinued (Plaintiff reported it was not effective), increased Tramadol to 50 mg 3 times per day, increased Gabapentin to 400 mg one in morning and two at night. (Filing No. 43-1 at CM/ECF p. 34.) Dr. Hustad strongly encouraged Plaintiff to comply with physical therapy recommendations and expressed his "long-term prognosis is to be found in non-medication modalities." (Filing No. 43-1 at CM/ECF p. 34.)

35.     On December 23, 2015, Plaintiff was given 60 mg of Ketorolac after feeling pain from lifting heavy milk carts. (Filing No. 43-1 at CM/ECF p. 35.)

36.     On December 31, 2015, Dr. Hustad saw Plaintiff to follow-up on his low back and neck pain. (Filing No. 43-1 at CM/ECF p. 36.) Dr. Hustad requested a neurosurgical consultation to evaluate possible carpal tunnel syndrome and Plaintiff's low back pain in light of his MRI in October 2015. (Filing No. 43-1 at CM/ECF p. 37.) Dr. Hustad ordered an X-ray of Plaintiff's cervical spine, thoracic spine, and lumbar sacral spine. (Filing No. 43-1 at CM/ECF p. 37.) Dr. Hustad increased Plaintiff's Gabapentin to 600 mg in the morning and 1200 mg at night. (Filing No. 43-1 at CM/ECF p. 37.) Dr. Hustad reviewed and continued Plaintiff's other prescriptions such as Methocarbamol 750 mg twice a day and Tramadol 50 mg three times a day. (Filing No. 43-1 at CM/ECF p. 38.)

37.     On January 5, 2016, Plaintiff had an X-ray of lumbar, thoracic, and cervical spine per Dr. Hustad's order. ([Filing No. 43-1 at CM/ECF p. 39](#).) Radiograph of the cervical, thoracic, and lumbar spine resulted in normal impression. ([Filing No. 43-1 at CM/ECF p. 39](#).)

38.     On January 19, 2016, Dr. Hustad sent Plaintiff to an outside neurological and spinal surgery consult regarding his back pain. ([Filing No. 43-1 at CM/ECF pp. 41-42](#).) Consult determined there was nothing surgical to offer for Plaintiff's back pain and "really doubt[ed]" that injections would be helpful either. ([Filing No. 43-1 at CM/ECF pp. 42-43](#).)

39.     On February 2, 2016, Dr. Kohl approved Plaintiff to see an outside orthopedic surgeon for a consultation regarding a cyst on his wrist and hand pain. ([Filing No. 43-1 at CM/ECF p. 43](#).)

40.     On February 4, 2016, Plaintiff received an X-ray of his hand. ([Filing No. 43-1 at CM/ECF p. 44](#).)

41.     On February 23, 2016, per Dr. Hustad's referral, Plaintiff met with an outside orthopedic surgeon who explained treatment options for his cyst on his wrist to include observation, compression, aspiration, and surgical excision. ([Filing No. 43-1 at CM/ECF pp. 45-48](#).) Plaintiff indicated he wished to proceed with surgery. ([Filing No. 43-1 at CM/ECF p. 46](#).)

42.     On March 1, 2016, Dr. Hustad met with Plaintiff to discuss the surgical consult and Plaintiff's back and elbow pain. ([Filing No. 43-1 at CM/ECF p. 48](#).) Since the time of the consult with the orthopedic surgeon, the cyst on Plaintiff's hand had "gone away" and was no longer causing symptoms. ([Filing No. 43-1 at CM/ECF p. 48](#).) Dr. Hustad ordered X-rays of both of Plaintiff's elbows because of complaints of chronic pain. ([Filing No. 43-1 at CM/ECF p. 48](#).) Dr. Hustad discussed with Plaintiff the possibility of using Cyclobenzaprine for musculoskeletal pain;

however, a drug interaction query indicated increased risk of seizures if taken concomitantly with Tramadol. ([Filing No. 43-1 at CM/ECF p. 48](#).) As such, Dr. Hustad chose not to prescribe Cyclobenzaprine at that time. ([Filing No. 43-1 at CM/ECF p. 48](#).) Dr. Hustad recommended Plaintiff complete his physical therapy regarding his back pain. ([Filing No. 43-1 at CM/ECF p. 48](#).) Dr. Hustad renewed Plaintiff's Tramadol prescription for two more weeks. ([Filing No. 43-1 at CM/ECF p. 48](#).)

43.     On March 3, 2016, per Dr. Hustad's request, Plaintiff received X-rays of both elbows. ([Filing No. 43-1 at CM/ECF p. 49](#).)

44.     On March 29, 2016, Dr. Hustad met with Plaintiff following receipt of IIRs concerning neck pain. ([Filing No. 43-1 at CM/ECF p. 50](#).) Dr. Hustad ordered X-rays, encouraged continued physical therapy, renewed Plaintiff's lower bunk pass for 180 days, renewed Plaintiff's prescription of Tramadol, and scheduled to see Plaintiff again after he had completed more X-rays and physical therapy. ([Filing No. 43-1 at CM/ECF p. 50](#).)

45.     On March 31, 2016, Plaintiff received a medical equipment pass for a back support/brace. ([Filing No. 43-1 at CM/ECF p. 51](#).)

46.     On April 5, 2016, per Dr. Hustad's request, Plaintiff received a cervical spine X-ray for his neck pain. ([Filing No. 43-1 at CM/ECF p. 52](#).)

47.     On April 12, 2016, Dr. Hustad met with Plaintiff to follow-up on his neck pain. ([Filing No. 43-1 at CM/ECF p. 53](#).) The X-rays taken on April 5, 2016 revealed Plaintiff's C-spine was negative for abnormalities. ([Filing No. 43-1 at CM/ECF p. 53](#).) Dr. Hustad informed Plaintiff he spoke with Plaintiff's physical therapist who prescribed using a Theraband and doing his home exercise program as recommended. ([Filing No. 43-1 at CM/ECF p. 53](#).) Dr. Hustad advised Plaintiff to continue present medications as recommended for back pain. ([Filing No. 43-1 at CM/ECF p. 53](#).) Plaintiff complained of foot pain. ([Filing No. 43-1 at CM/ECF p.

53.) Dr. Hustad indicated he would inquire about getting loafers for Plaintiff to help with arch support. (Filing No. 43-1 at CM/ECF p. 53.

48.     On May 5, 2016, Plaintiff received a medical equipment pass for a TENS unit with wires and electrodes. (Filing No. 43-1 at CM/ECF p. 54.)

49.     On May 13, 2016, Plaintiff received black Velcro shoes from medical. (Filing No. 43-1 at CM/ECF p. 55.)

50.     On May 24, 2016, Dr. Hustad met with Plaintiff to follow-up regarding his various pain issues. (Filing No. 43-1 at CM/ECF p. 56.) Plaintiff indicated that his back pain seemed to be better with current medical regimen and physical therapy and TENS unit use. (Filing No. 43-1 at CM/ECF p. 56.) Dr. Hustad and Plaintiff discussed issues with Plaintiff's hand. (Filing No. 43-1 at CM/ECF p. 56.) Dr. Hustad ordered follow-up consultation with an outside orthopedic surgeon, Dr. Machado. (Filing No. 43-1 at CM/ECF p. 56.) Plaintiff requested to be prescribed Amitriptyline to help him with his shoulder and back pain when he sleeps. (Filing No. 43-1 at CM/ECF p. 56.) Dr. Hustad advised Plaintiff he would perform a drug interaction query and determine if it would be safe to consider adding Amitriptyline to his medication regimen. (Filing No. 43-1 at CM/ECF p. 56.)

51.     On June 20, 2016, Plaintiff met with medical complaining of neuropathic pain in the afternoon. (Filing No. 43-1 at CM/ECF p. 57.) Medical advised it would increase Gabapentin dose for better afternoon coverage. (Filing No. 43-1 at CM/ECF p. 57.)

52.     On August 11, 2016, Dr. Hustad renewed Plaintiff's prescription for Tramadol. (Filing No. 43-1 at CM/ECF p. 58.)

53.     On August 30, 2016, Dr. Hustad met with Plaintiff to discuss hand pain and possibility of surgery. (Filing No. 43-1 at CM/ECF p. 59.) Dr. Hustad explained that the outside orthopedic surgeon did not recommend surgery but encouraged

Plaintiff to seek a second opinion if he wished. (Filing No. 43-1 at CM/ECF p. 59.) Dr. Hustad expressed he would request over-the-counter arch supports to help with Plaintiff's foot pain. (Filing No. 43-1 at CM/ECF p. 59.)

54.     On September 20, 2016, Dr. Hustad met with Plaintiff for follow-up regarding foot, joint, and hand pain. (Filing No. 43-1 at CM/ECF p. 61.) Dr. Hustad advised Plaintiff to continue current medications for joint pain and that he was approved for consultation for a second opinion regarding his hand and was approved for over-the-counter arch supports. (Filing No. 43-1 at CM/ECF p. 61.)

55.     On September 20, 2016, Plaintiff received a lower-bunk pass for 180 days. (Filing No. 43-1 at CM/ECF p. 62.)

56.     On September 22, 2016, medical gave Plaintiff replacement loafers. (Filing No. 43-1 at CM/ECF p. 60.)

57.     On September 26, 2016, medical provided Plaintiff with orthotic arch supports. (Filing No. 43-1 at CM/ECF p. 63.)

58.     On November 8, 2016, Dr. Hustad met with Plaintiff to discuss ongoing pain in his right hand. (Filing No. 43-1 at CM/ECF pp. 64-65.) Dr. Hustad sent Plaintiff's records and images of his hand to an outside provider, Dr. Gove, for Plaintiff's requested second opinion. (Filing No. 43-1 at CM/ECF p. 64.) Dr. Gove reviewed records and had nothing else to offer that was not already presented by the first consulting orthopedic surgeon, Dr. Machado, and thus refused to see Plaintiff for this problem. (Filing No. 43-1 at CM/ECF p. 64.) Plaintiff also complained of knee pain incident to a recent fall. (Filing No. 43-1 at CM/ECF p. 64.) Dr. Hustad ordered X-rays of Plaintiff's knee and patella, as well as a consult request of physical therapy to help recommend non-operative and non-medication modalities regarding his right hand pain. (Filing No. 43-1 at CM/ECF p. 65.) Dr. Hustad noted he would follow-up after physical therapy and results of X-rays. (Filing No. 43-1 at CM/ECF p. 65.)

59.     On November 14, 2016, Plaintiff received an X-ray of his right knee. (Filing No. 43-1 at CM/ECF p. 66.) The X-ray indicated moderate suprapatellar knee joint effusion but no fracture or dislocation was observed. (Filing No. 43-1 at CM/ECF p. 66.)

60.     On November 17, 2016, Plaintiff underwent a physical therapy evaluation. (Filing No. 43-1 at CM/ECF p. 65.)

61.     On December 13, 2016, Dr. Hustad met with Plaintiff and discussed a consult request for physical therapy for Plaintiff's knee pain. (Filing No. 43-1 at CM/ECF pp. 67-68.) Dr. Hustad also sent a consult request to an orthopedic foot and ankle specialist for evaluation of Plaintiff's foot pronation and foot pain. (Filing No. 43-1 at CM/ECF pp. 67-68.)

62.     On December 22, 2016, Plaintiff's medical equipment pass for a TENS unit with electrodes, wires, and battery was renewed. (Filing No. 43-1 at CM/ECF p. 69.)

63.     On January 12, 2017, Plaintiff received X-rays of his right elbow. (Filing No. 43-1 at CM/ECF p. 70.)

64.     On January 27, 2017, Plaintiff was sent to an outside orthopedic specialist who provided an injection of 14 mg of Celestone, 60 mg of Marcaine, and 60 mg of Lidocaine on Plaintiff's knee. (Filing No. 43-1 at CM/ECF pp. 71-72.) The orthopedic specialist also recommended bilateral custom molded orthotics to help Plaintiff's feet. (Filing No. 43-1 at CM/ECF p. 73.)

65.     On February 2, 2017, an X-ray of Plaintiff's right elbow was ordered. (Filing No. 43-1 at CM/ECF p. 74.)

66.     On February 7, 2017, per Dr. Hustad's request, Plaintiff received an X-ray of his right elbow. (Filing No. 43-1 at CM/ECF p. 75.) No fracture deformity or joint effusion was identified, and the soft tissue was normal. (Filing No. 43-1 at CM/ECF p. 75.) There was "a stable small rounded ossification at the medial epicondyle, likely related to remote medial epicondylitis." (Filing No. 43-1 at CM/ECF p. 75.)

67.     On February 14, 2017, per Dr. Hustad's request, Dr. Deol approved bilateral custom molded orthotics for Plaintiff. (Filing No. 43-1 at CM/ECF p. 80.)

68.     On March 2, 2017, Dr. Hustad met with Plaintiff to discuss pain in his feet, wrist, elbows, and knee. (Filing No. 43-1 at CM/ECF p. 76.) Dr. Hustad prescribed Naproxen 250 mg on a short-term basis to see if it helped with pain, cold packs daily for Plaintiff's right hand pain, asked the physical therapist to contact him to discuss Plaintiff's right hand and his assessment of it, and ordered new X-rays of Plaintiff's elbows. (Filing No. 43-1 at CM/ECF p. 77.) Dr. Hustad planned to follow-up with Plaintiff in 4-6 weeks after X-rays, physical therapy, and trial of medications. (Filing No. 43-1 at CM/ECF p. 77.)

69.     On March 3, 2017, Plaintiff received a medical equipment pass for an edema glove for his hand. (Filing No. 43-1 at CM/ECF p. 78.)

70.     On March 15, 2017, Dr. Hustad refilled Plaintiff's Tramadol 50 mg prescription. (Filing No. 43-1 at CM/ECF p. 79.)

71.     On March 29, 2017, Plaintiff was seen by P.A. Vaughan Wenzel after Plaintiff sustained an injury in a fight, as well as for back pain. (Filing No. 43-1 at CM/ECF p. 81.) Plaintiff was prescribed Ibuprofen 800 mg for 3 days and was continued on Tramadol 100 mg. (Filing No. 43-1 at CM/ECF p. 82.) Medical noted that Cyclobenzaprine was "ABSOLUTELY [contraindicated] with other psych meds he takes" and with Gabapentin "that he is already taking for low back pain." (Filing No. 43-1 at CM/ECF p. 82.) X-rays and an MRI were ordered for Plaintiff's

spine. (Filing No. 43-1 at CM/ECF p. 83.) Plaintiff was also referred for a physical therapy evaluation. (Filing No. 43-1 at CM/ECF p. 83.)

72.     On March 29, 2017, custom molded foot orthotics were issued to Plaintiff. (Filing No. 43-1 at CM/ECF pp. 81, 84.)

73.     On April 3, 2017, Plaintiff received an X-ray of his lumbar spine in which no evidence of fracture or subluxation was observed; vertebral body heights and intervertebral disc spaces were maintained; sacroiliac joints were normal in appearance; and soft tissue were unremarkable. (Filing No. 43-1 at CM/ECF pp. 85-86.)

74.     On April 7, 2017, Plaintiff was scheduled and received an MRI of his lumbar spine. (Filing No. 43-1 at CM/ECF p. 88.)

75.     On April 7, 2017, Plaintiff's prescription of Gabapentin was renewed. (Filing No. 43-1 at CM/ECF p. 88.)

76.     On April 14, 2017, Defendant P.A. Dan Danaher renewed Plaintiff's prescription for Methocarbamol for 60 days. (Filing No. 43-1 at CM/ECF p. 89.)

77.     On April 19, 2017, Plaintiff met with P.A. Wenzel to discuss Plaintiff's MRI. (Filing No. 43-1 at CM/ECF p. 90.) P.A. Wenzel noted Plaintiff was already on Tramadol 100 mg three times per day, Ibuprofen three times per day, and Gabapentin 900 mg two times per day. (Filing No. 43-1 at CM/ECF p. 90.) P.A. Wenzel increased Plaintiff's Gabapentin prescription to 1200 mg. (Filing No. 43-1 at CM/ECF p. 90.)

78.     Dr. Hustad renewed Plaintiff's prescription for Tramadol 50 mg, two tablets, three times per day, starting on May 3, 2017. (Filing No. 43-1 at CM/ECF p. 91.)

79.     On May 23, 2017, Plaintiff failed to attend his appointment at the chronic care clinic to discuss knee pain. (Filing No. 43-1 at CM/ECF p. 92.)

80.     On June 6, 2017, P.A. Danaher met with Plaintiff after complaints of foot, knee, elbow, and back pain. (Filing No. 43-1 at CM/ECF pp. 95-98.) P.A. Danaher noted Plaintiff was taking 100 mg Tramadol, 1200 mg Gabapentin, and 800 mg Motrin. (Filing No. 43-1 at CM/ECF p. 96.) Plaintiff said that he was in "severe pain" in his low-back since 2012 and is still in pain and that it was difficult to do anything. (Filing No. 43-1 at CM/ECF p. 95.) P.A. Danaher expressed to Plaintiff that if the "current meds [have] no benefit we should discontinue." (Filing No. 43-1 at CM/ECF p. 96.) Plaintiff became defensive and stated those medications "help a little." (Filing No. 43-1 at CM/ECF p. 96.) Following his exam of Plaintiff, P.A. Danaher noted that he did not see any indication for additional pain medications and that "NSAIDs" were most appropriate. (Filing No. 43-1 at CM/ECF p. 97.) P.A. Danaher also questioned the benefits of muscle relaxants for what was found on the MRI. (Filing No. 43-1 at CM/ECF p. 98.)

81.     On June 20, 2017, P.A. Danaher met with Plaintiff regarding low back pain and foot pain. (Filing No. 43-1 at CM/ECF p. 98.) Plaintiff indicated he wanted stronger pain medication; specifically, an increase in Tramadol. (Filing No. 43-1 at CM/ECF p. 98.) P.A. Danaher noted he would be hesitant to increase his current pain medication and that Plaintiff should be prepared to taper off Tramadol. (Filing No. 43-1 at CM/ECF p. 99.) P.A. Danaher discussed physical therapy and modifying Plaintiff's activity. (Filing No. 43-1 at CM/ECF p. 99.)

82.     On July 2, 2017, Plaintiff met with medical complaining of right hand discomfort. (Filing No. 43-1 at CM/ECF p. 100.) Notes indicate that his left hand was slightly swollen his hand grasps were strong and equal to both hands. (Filing No. 43-1 at CM/ECF p. 100.) Plaintiff was given an ice bag and informed he should alert staff if any further issues arose. (Filing No. 43-1 at CM/ECF p. 100.)

83.     On July 18, 2017, Plaintiff failed to show for his scheduled appointment regarding foot pain. (Filing No. 43-1 at CM/ECF p. 101.)

84.     On July 24, 2017, Plaintiff missed another scheduled appointment regarding his foot pain. (Filing No. 43-1 at CM/ECF p. 102.)

85.     On July 25, 2017, P.A. Danaher refilled Plaintiff's Tramadol 50 mg prescription. (Filing No. 43-1 at CM/ECF p. 103.)

86.     On July 31, 2017, Plaintiff failed to show for his scheduled appointment regarding joint pain. (Filing No. 43-1 at CM/ECF p. 104.)

87.     On August 3, 2017, Plaintiff saw medical after Plaintiff stated he hit elbows against a railing on the stairs. (Filing No. 43-1 at CM/ECF p. 105.) After medical examined Plaintiff, he was provided with two ACE bandage wraps. (Filing No. 43-1 at CM/ECF pp. 105, 107.)

88.     On August 3, 2017, Plaintiff was given a "Notice of Medical Lay-In/Limited Activity" in which he was restricted from lifting greater than 20 pounds and from engaging in contact or non-contact sports such as weightlifting, basketball, handball, etc. (Filing No. 43-1 at CM/ECF p. 106.) This activity restriction was designated to last until December 3, 2017. (Filing No. 43-1 at CM/ECF p. 106.)

89.     On August 7, 2017, Plaintiff was seen by an outside orthopedic specialist regarding his foot pain. (Filing No. 43-1 at CM/ECF pp. 108-09.) The outside provider noted Plaintiff was currently taking, among other medications, Gabapentin 300 mg and Tramadol 50 mg. (Filing No. 43-1 at CM/ECF p. 108.) The provider noted, "I would encourage [Plaintiff] to talk to the medical personnel there about possibly switching him from [G]abapentin to Lyrica or if possible increase the dose of his Gabapentin" for his foot pain. (Filing No. 43-1 at CM/ECF p. 109.)

90.     On August 14, 2017, P.A. Danaher saw Plaintiff regarding allergies and elbow pain. (Filing No. 43-1 at CM/ECF p. 110.) P.A. Danaher noted the outside provider's recommendation for a trial of Lyrica for peripheral neuropathy. (Filing No. 43-1 at CM/ECF p. 110.) P.A. Danaher noted Plaintiff was already on Gabapentin and Tramadol. (Filing No. 43-1 at CM/ECF p. 110.)

91.     On August 28, 2017, P.A. Danaher saw Plaintiff for foot pain and increased frequency in urination. (Filing No. 43-1 at CM/ECF pp. 112-14.) P.A. Danaher noted Plaintiff was already taking Tramadol and Gabapentin 1200 mg three times a day (3600 mg total). (Filing No. 43-1 at CM/ECF p. 112, 114.) Plaintiff stated that those medications and orthotics were of no benefit for his feet. (Filing No. 43-1 at CM/ECF p. 112.) P.A. Danaher renewed prescription for Motrin and started him on Pyridoxine. (Filing No. 43-1 at CM/ECF p. 114.)

92.     On August 28, 2017, P.A. Danaher rescinded Plaintiff's "Medical Limited Activity" pass because Plaintiff was seen playing handball. (Filing No. 43-1 at CM/ECF p. 115.)

93.     On August 31, 2017, P.A. Danaher discussed with Plaintiff that he had watched him play handball on August 28, 2017 at a high level. (Filing No. 43-1 at CM/ECF p. 116.) Plaintiff acknowledged that he had in fact played handball. (Filing No. 43-1 at CM/ECF p. 116.) P.A. Danaher stated he would be tapering Plaintiff off his Tramadol, noting that "someone [who] could play hand ball at the level [he] saw [Plaintiff] [playing] on [August 28, 2017] should not be on Tramadol or other narcotic medications to treat pain." (Filing No. 43-1 at CM/ECF p. 116.) P.A. Danaher informed Plaintiff he would continue his Gabapentin, but he would not agree to Plaintiff playing handball on this medication. (Filing No. 43-1 at CM/ECF p. 116.) P.A. Danaher informed Plaintiff that, in his opinion, the Gabapentin and Ibuprofen would be sufficient and that he should avoid activities that caused increased pain. (Filing No. 43-1 at CM/ECF p. 117.)

94.     On August 31, 2017, PA-C Danaher ordered (1) Plaintiff's activity restrictions cancelled, (2) a step-down tapering of Tramadol, (3) Gabapentin and Ibuprofen to be continued, and (4) modified activities with no sports or weightlifting. (Filing No. 43-1 at CM/ECF p. 117.) P.A. Danaher had discussed this plan with Dr. Hustad the previous day. (Filing No. 43-1 at CM/ECF p. 117.)

95.     On September 11, 2017, Plaintiff failed to show for his scheduled medical appointment. (Filing No. 43-1 at CM/ECF p. 118.)

96.     On October 2, 2017, P.A. Danaher met with Plaintiff to discuss his foot pain. (Filing No. 43-1 at CM/ECF p. 120.)

97.     On October 3, 2017, P.A. Danaher discussed with Dr. Kasselman possibilities for chronic pain management for Plaintiff. (Filing No. 43-1 at CM/ECF p. 121.) Dr. Kasselman recommended lab tests to evaluate if monthly B12 injections would be beneficial. (Filing No. 43-1 at CM/ECF p. 121.)

98.     On October 16, 2017, Plaintiff received a lower bunk pass assignment for 365 days. (Filing No. 43-1 at CM/ECF p. 119.)

99.     On October 18, 2017, Plaintiff refused the lab draw. (Filing No. 43-1 at CM/ECF p. 122.)

100.    On October 19, 2017, Plaintiff refused the lab draw again. (Filing No. 43-1 at CM/ECF p. 122.)

101.    On November 2, 2017, P.A. Danaher met with Plaintiff to discuss labs and pain management. (Filing No. 43-1 at CM/ECF pp. 123-24.) P.A. Danaher ordered 1200 mg Gabapentin to be continued but indicated it would eventually decrease to two times per day. (Filing No. 43-1 at CM/ECF p. 124.) P.A. Danaher offered Plaintiff a B12 injection and to be evaluated by Dr. Kasselman, and Plaintiff agreed to both. (Filing No. 43-1 at CM/ECF p. 124.)

102.   On November 7, 2017, Plaintiff received an X-ray after reporting headaches. (Filing No. 43-1 at CM/ECF p. 125.) No definite radiographic explanation for headaches was found. (Filing No. 43-1 at CM/ECF p. 125.)

103.   On November 16, 2017, Dr. Hustad met with Plaintiff to discuss issues with rectal bleeding, neuropathic pain in his feet, and pain radiating from his neck into his hand. (Filing No. 43-1 at CM/ECF pp. 126-27.) Dr. Hustad noted Plaintiff "continues to do a lot of exercises working on 'a monkey bar.'" (Filing No. 43-1 at CM/ECF p. 126.) Dr. Hustad noted Plaintiff has "excellent strength of upper extremities and grip bilaterally" and has "[n]o motor weakness." (Filing No. 43-1 at CM/ECF p. 126.) Dr. Hustad instructed Plaintiff to discontinue working out with a monkey bar or performing pull-ups. (Filing No. 43-1 at CM/ECF p. 127.) Dr. Hustad made a note to discuss Plaintiff's medications with P.A. Danaher. (Filing No. 43-1 at CM/ECF p. 127.)

104.   On December 7, 2017, Plaintiff was seen by Dr. Kasselman at the pain clinic. (Filing No. 43-1 at CM/ECF p. 128.) P.A. Danaher ordered Gabapentin be tapered off and discontinued and prescribed a muscle relaxer (Flexeril) for three weeks and Indocin 25 mg twice per day. (Filing No. 43-1 at CM/ECF p. 128.)

105.   On December 15, 2017, Plaintiff received a medical equipment pass for "hot packs." (Filing No. 43-1 at CM/ECF p. 129.)

106.   On December 18, 2017, P.A. Danaher met with Plaintiff to discuss pain management and trigger point injections to help treat his pain. (Filing No. 43-1 at CM/ECF pp. 130-32.) Plaintiff expressed that he was upset his prescription for Gabapentin was being discontinued. (Filing No. 43-1 at CM/ECF p. 131.) P.A. Danaher noted Plaintiff claimed to have continuous pain throughout his body (feet, back, elbows, etc.) while on the maximum dose of Gabapentin and this was why Dr. Kasselman recommended "he come off the Gabapentin." (Filing No. 43-1 at CM/ECF p. 131.) P.A. Danaher instead offered Plaintiff Indomethacin for pain as

Dr. Kasselman recommended. ([Filing No. 43-1 at CM/ECF p. 131](#).) Plaintiff agreed to take it. ([Filing No. 43-1 at CM/ECF p. 131](#).) P.A. Danaher informed Plaintiff they probably would never be able to make him completely pain free but could provide some comfort with their treatment plans. ([Filing No. 43-1 at CM/ECF p. 131](#).) Plaintiff agreed to try trigger point injections. ([Filing No. 43-1 at CM/ECF p. 131](#).)

107.  On December 21, 2017, prior to signing the consent for his injections, Plaintiff and P.A. Danaher met to discuss the injections. ([Filing No. 43-1 at CM/ECF p. 133](#).) Plaintiff and P.A. Danaher went into an exam room, and P.A. Danaher reviewed with Plaintiff his X-rays from December 19, 2017. ([Filing No. 43-1 at CM/ECF p. 133](#).) Plaintiff became argumentative when P.A. Danaher informed Plaintiff that his newly alleged mid-back pain was not consistent with the X-ray findings. ([Filing No. 43-1 at CM/ECF p. 133](#).) Plaintiff responded that P.A. Danaher did not know what he was doing. ([Filing No. 43-1 at CM/ECF p. 133](#).) P.A. Danaher responded by saying medical had been addressing multiple pain issues with Plaintiff regarding his back, elbows, feet, and headaches. ([Filing No. 43-1 at CM/ECF p. 133](#).) Plaintiff began to curse and "got out of chair without difficulty and walked out of exam room." ([Filing No. 43-1 at CM/ECF p. 134](#).)

108.  On December 27, 2017, P.A. Danaher and Dr. Hustad prescribed Cyclobenzaprine 10 mg twice daily for pain. ([Filing No. 43-1 at CM/ECF p. 135](#).)

109.  On January 11, 2018, Plaintiff was admitted to the skilled nursing facility at DEC after reporting he "twisted and heard [a] 'loud pop'" in the middle of his back and passed out. ([Filing No. 43-1 at CM/ECF p. 137](#).) Plaintiff received an intramuscular injection of Toradol 60 mg for the pain. ([Filing No. 43-1 at CM/ECF p. 138](#).) Dr. Hustad recommended continued bedrest through the weekend, but Plaintiff refused because he had a family visit scheduled. ([Filing No. 43-1 at CM/ECF p. 139](#).)

110.  On January 12, 2018, Plaintiff was examined by Dr. Hustad and received an X-ray which revealed that his mild anterior wedging of T11 was

unchanged from prior exams and that there was no acute osseous abnormality or malalignment elsewhere in the thoracic spine. (Filing No. 43-1 at CM/ECF p. 140.)

111.   On January 12, 2018, Plaintiff received a "Medical Limited Activity" pass which restricted physical exertion, lifting greater than 0 pounds, and contact and non-contact sports. (Filing No. 43-1 at CM/ECF p. 142.)

112.   On January 18, 2018, Plaintiff met with medical about his back pain. (Filing No. 43-1 at CM/ECF p. 143.) Plaintiff stated Gabapentin "did help but did not 'cure [the] problem.'" (Filing No. 43-1 at CM/ECF p. 143.)

113.   On February 2, 2018, P.A. Danaher met with Plaintiff to discuss back and foot pain, as well as wrist pain after he allegedly fell on the ice on January 29, 2018. (Filing No. 43-1 at CM/ECF p. 144.) Plaintiff indicated he was not taking his psych meds except for Hydroxyzine. (Filing No. 43-1 at CM/ECF p. 144.) Plaintiff stated he was not receiving any benefit from his prescription of Flexeril for pain. (Filing No. 43-1 at CM/ECF p. 145.) P.A. Danaher offered to switch him to Robaxin, but Plaintiff declined. (Filing No. 43-1 at CM/ECF p. 145.) P.A. Danaher offered NSAIDs and named various types for Plaintiff: Motrin, Naproxen, Indocin, Mobic. (Filing No. 43-1 at CM/ECF p. 145.) Plaintiff stated that none of these medications helped him in the past. (Filing No. 43-1 at CM/ECF p. 145.) Plaintiff reiterated that the only medications that have helped his pain are Gabapentin and Tramadol. (Filing No. 43-1 at CM/ECF p. 145.) Plaintiff went on to repeat his previous injuries over the years causing his chronic pain. (Filing No. 43-1 at CM/ECF p. 145.) P.A. Danaher explained that this was unfortunate, but narcotics were not the answer. (Filing No. 43-1 at CM/ECF p. 145.) P.A. Danaher explained that he had discussed Plaintiff's chronic pain management with Plaintiff's psychiatrist, Dr. Howard, and that he could schedule Plaintiff for a follow-up with Dr Kasselman. (Filing No. 43-1 at CM/ECF p. 145.) Plaintiff stated again that Tramadol and Gabapentin would be the only prescription that would help him. (Filing No. 43-1 at CM/ECF p. 145.) P.A. Danaher informed Plaintiff that he would not prescribe either. (Filing No. 43-1 at CM/ECF p. 145.) P.A. Danaher noted that during his discussion with Plaintiff, he

did not appear in any distress, was moving his wrists and hands freely, and was making gestures without signs of pain or limitation. (Filing No. 43-1 at CM/ECF p. 146.) P.A. Danaher also noted Plaintiff walked in and sat down without evidence of limitation or distress. (Filing No. 43-1 at CM/ECF p. 146.) Upon leaving his appointment, Plaintiff used both hands to push off the chair arms without any problems. (Filing No. 43-1 at CM/ECF p. 146.)

114.   On February 15, 2018, Plaintiff met with Psychiatrist Dr. Howard and changed his prescription to Abilify for depression. (Filing No. 43-1 at CM/ECF p. 147.) Plaintiff did not complain about pain during the visit with Dr. Howard until she asked him about it. (Filing No. 43-1 at CM/ECF p. 147.) Dr. Howard recommended mental health therapy to help deal with chronic pain issues. (Filing No. 43-1 at CM/ECF p. 147.)

115.   On February 15, 2018, Plaintiff met with Dr. Kasselman for a pain clinic consultation. (Filing No. 43-1 at CM/ECF p. 148.) Plaintiff informed Dr. Kasselman he had a five-year-old wedge compression that was causing his pain. (Filing No. 43-1 at CM/ECF p. 148.) Plaintiff also claimed his wrist was dislocated. (Filing No. 43-1 at CM/ECF p. 148.) Plaintiff complained of receiving inadequate care. (Filing No. 43-1 at CM/ECF p. 148.) Dr. Kasselman noted Plaintiff's complaints did not correlate with any physical findings. (Filing No. 43-1 at CM/ECF p. 148.) Plaintiff complained of something "moving" in his back. (Filing No. 43-1 at CM/ECF p. 148.) When Dr. Kasselman explained possible sources, Plaintiff became belligerent. (Filing No. 43-1 at CM/ECF p. 148.) Dr. Kasselman could not find any obvious sources of Plaintiffs "10/10" reported pain. (Filing No. 43-1 at CM/ECF p. 148.) Plaintiff refused the solutions Dr. Kasselman offered, but requested Gabapentin, Lyrica, or narcotics. (Filing No. 43-1 at CM/ECF p. 148.) Dr. Kasselman offered physical therapy, trigger point injections, and NSAIDs. (Filing No. 43-1 at CM/ECF p. 148.) Plaintiff refused everything and left angrily. (Filing No. 43-1 at CM/ECF p. 148.) Plaintiff was instructed to submit an IIR if he wanted to have injections. (Filing No. 43-1 at CM/ECF p. 147.) Plaintiff declined NSAIDs. (Filing No. 43-1 at CM/ECF p. 147.)

116.    On March 7, 2018, Plaintiff received an X-ray on his left wrist. (Filing No. 43-1 at CM/ECF p. 149.) No acute fracture or dislocation of the left wrist was observed. (Filing No. 43-1 at CM/ECF p. 149.)

117.    On March 7, 2018, Plaintiff submitted an IIR to try Meloxicam for his pain. (Filing No. 43-1 at CM/ECF p. 150.) Medical ordered it for him. (Filing No. 43-1 at CM/ECF p. 150.)

118.    On March 23, 2018, P.A. Danaher saw Plaintiff regarding pain in his wrists. (Filing No. 43-1 at CM/ECF p. 151.) Plaintiff stated he wanted a second opinion for his chronic pain. (Filing No. 43-1 at CM/ECF p. 151.) P.A. Danaher informed Plaintiff he would present it to the NDCS medical review committee. (Filing No. 43-1 at CM/ECF p. 152.) Plaintiff also requested a "lay-in" from his job. (Filing No. 43-1 at CM/ECF p. 151.) P.A. Danaher agreed to give Plaintiff a pass for limited activity for 60 days. (Filing No. 43-1 at CM/ECF p. 152.) This pass excused Plaintiff from standing for lengthy periods, lifting anything exceeding 10 pounds, performing any work above his head, and pushing or pulling; the pass also ordered minimized wrist activities. (Filing No. 43-1 at CM/ECF p. 152.)

119.    On March 29, 2018, P.A. Danaher noted that he had Plaintiff on a list to be seen by Dr. Kasselman for a reevaluation and that he would present Plaintiff's issues at the next provider meeting. (Filing No. 43-1 at CM/ECF p. 153.)

120.    On April 12, 2018, Dr. Kasselman saw Plaintiff at the pain clinic. (Filing No. 43-1 at CM/ECF p. 154.) After examination, Dr. Kasselman ordered Naproxen 500 mg for pain. (Filing No. 43-1 at CM/ECF p. 154.) P.A. Danaher ordered activity restrictions to include limited bending, stooping, pushing and pulling, not lifting greater than 20 pounds, no sports activity, and limited repetitive movements. (Filing No. 43-1 at CM/ECF p. 154.) This activity restriction was prescribed for one year. (Filing No. 43-1 at CM/ECF p. 154.)

121.  On May 21, 2018, Plaintiff submitted an IIR requesting to try Indomethacin for pain. ([Filing No. 43-1 at CM/ECF p. 155](#).) On May 24, 2018, P.A. Danaher ordered the Indomethacin and informed Plaintiff to stop the Naproxen. ([Filing No. 43-1 at CM/ECF p. 155](#).)

122.  On May 30, 2018, Plaintiff received a "Medical Limited Activity" pass restricting Plaintiff from standing for periods longer than 30 minutes, lifting anything greater than 20 pounds, bending or stooping, participating in contact or non-contact sports, and performing repetitive movements of the upper extremities. ([Filing No. 43-1 at CM/ECF p. 156](#).)

123.  On June 8, 2018, P.A. Danaher met with Plaintiff for hand, foot, and back pain. ([Filing No. 43-1 at CM/ECF p. 157-58](#).) Plaintiff said he did not receive any benefit from Duloxetine. ([Filing No. 43-1 at CM/ECF p. 157](#).) P.A. Danaher noted Plaintiff was currently on Flexeril 50 mg, but Plaintiff said it was not helping with the pain. ([Filing No. 43-1 at CM/ECF p. 157](#).) P.A. Danaher noted that during the exam, Plaintiff did not appear in distress, ambulated to exam room without difficulty, sat and stood without problem, removed shoes and socks without difficulty, and showed no signs of discomfort. ([Filing No. 43-1 at CM/ECF p. 158](#).) P.A. Danaher noted that he would email Plaintiff's psychiatrist, Dr. Anit, APRN Chipendo, and Dr. Hustad regarding a joint consultation to meet with Plaintiff and discuss chronic pain management. ([Filing No. 43-1 at CM/ECF p. 158](#).)

124.  On June 14, 2018, P.A. Danaher, Dr. Hustad, Dr. Anit, APRN Chipendo, and RN Wright met to discuss Plaintiff's pain management. ([Filing No. 43-1 at CM/ECF p. 159](#).) During this meeting, Plaintiff's chart was reviewed with specific reference to Dr. Kasselman's notes. ([Filing No. 43-1 at CM/ECF p. 159](#).) This team noted Plaintiff had seen mental health providers regarding issues with anxiety and chronic pain. ([Filing No. 43-1 at CM/ECF p. 159](#).) Plaintiff had been treated with different medications and reported no benefit. ([Filing No. 43-1 at CM/ECF p. 159](#).) The team discussed recommendations for future treatment, including: (1) referral to mental health for evaluation for chronic pain management

and Cognitive Behavioral Therapy; (2) discuss physical therapy; (3) offer NSAIDs; and (4) meet with Dr. Anit and discuss psychiatric treatment. ([Filing No. 43-1 at CM/ECF p. 159](#).)

125.  On June 21, 2018, Plaintiff's prescription for Amitriptyline was discontinued because Plaintiff was not taking it. ([Filing No. 43-1 at CM/ECF p. 160](#).)

126.  On June 22, 2018, Plaintiff requested a refill of Indomethacin, which was immediately ordered. ([Filing No. 43-1 at CM/ECF p. 161](#).)

127.  On July 24, 2018, Plaintiff was to be seen by Dr. Kasselman at the pain clinic. ([Filing No. 43-1 at CM/ECF p. 162](#).) Dr. Kasselman expressed concern that Plaintiff exhibited drug seeking behavior but noted that Plaintiff had tried other conservative measures for pain management. ([Filing No. 43-1 at CM/ECF p. 162](#).) Dr. Kasselman ordered a trial of Gabapentin no higher than 800 mg twice a day. ([Filing No. 43-1 at CM/ECF p. 162](#).) Dr. Kasselman informed Plaintiff that the trial was conditioned upon his compliance with medical and lab draws. ([Filing No. 43-1 at CM/ECF p. 162](#).) Dr. Kasselman ordered that Gabapentin levels be tested in two weeks. ([Filing No. 43-1 at CM/ECF p. 162](#).)

128.  On July 24, 2018, Plaintiff informed P.A. Danaher that Plaintiff's custom orthotics were taken by custody staff and were never returned. ([Filing No. 43-1 at CM/ECF p. 163](#).) P.A. Danaher made a note to the Deputy Warden that the orthotics should be reissued to Plaintiff. ([Filing No. 43-1 at CM/ECF p. 163](#).)

129.  On August 1, 2018, Plaintiff had a medical appointment for oral and facial surgery from an outside medical provider. ([Filing No. 43-1 at CM/ECF p. 164](#).)

130.  On August 1, 2018, Plaintiff submitted an IIR complaining his right hand was in pain with arthritis. ([Filing No. 43-1 at CM/ECF p. 165](#).) The next day, on August 2, 2018, P.A. Danaher informed Plaintiff that he reordered Indomethacin

to take as needed for pain and would order X-rays. ([Filing No. 43-1 at CM/ECF p. 165](#).)

131. On August 16, 2018, Plaintiff received an X-ray of his right hand. ([Filing No. 43-1 at CM/ECF p. 166](#).) No acute fracture or destructive lesion was identified. ([Filing No. 43-1 at CM/ECF p. 166](#).) Chronic findings appeared to be posttraumatic with no acute abnormalities observed. ([Filing No. 43-1 at CM/ECF p. 166](#).)

132. On August 31, 2018, P.A. Danaher saw Plaintiff for wrist, hand, and back pain. ([Filing No. 43-1 at CM/ECF p. 167](#).) Plaintiff said he had "a little benefit" with the Gabapentin, but still in pain. ([Filing No. 43-1 at CM/ECF p. 167](#).) Plaintiff made no mention of his back or leg pain during the visit. ([Filing No. 43-1 at CM/ECF p. 168](#).) Based upon lab results, P.A. Danaher expressed concern that Plaintiff was not taking his prescription of Gabapentin as directed. ([Filing No. 43-1 at CM/ECF p. 169](#).) Plaintiff stated he was taking it regularly. ([Filing No. 43-1 at CM/ECF p. 169](#).) P.A. Danaher noted Plaintiff had not filled his prescription for Indocin since June of 2018. ([Filing No. 43-1 at CM/ECF p. 169](#).) When asked about this, Plaintiff said it caused gastrointestinal side effects. ([Filing No. 43-1 at CM/ECF p. 169](#).) P.A. Danaher reviewed with Plaintiff other NSAIDs available. ([Filing No. 43-1 at CM/ECF p. 169](#).) Plaintiff requested Ibuprofen. ([Filing No. 43-1 at CM/ECF p. 169](#).) P.A. Danaher asked if Plaintiff had been involved in Cognitive Behavioral Therapy, and Plaintiff reported that he had not. ([Filing No. 43-1 at CM/ECF p. 169](#).) Plaintiff stated that mental health told him about TENS therapy, but P.A. Danaher informed Plaintiff that it would only be provided through physical therapy. ([Filing No. 43-1 at CM/ECF p. 169](#).) P.A. Danaher also noted Plaintiff was on Topamax which was being used for chronic pain management. ([Filing No. 43-1 at CM/ECF p. 169](#).) P.A. Danaher noted Plaintiff did not appear to be in any distress during the visit. ([Filing No. 43-1 at CM/ECF p. 170](#).) Plaintiff walked, stood, and sat without difficulty. ([Filing No. 43-1 at CM/ECF p. 170](#).) P.A. Danaher ordered Ibuprofen and the discontinuation of Indocin. ([Filing No. 43-1 at CM/ECF p. 170](#).) P.A. Danaher noted that Gabapentin would be continued, even though low therapeutic levels were found

in his labs. ([Filing No. 43-1 at CM/ECF p. 170](#).) New levels would be taken in three weeks. ([Filing No. 43-1 at CM/ECF p. 170](#).) P.A. Danaher encouraged Plaintiff to discuss chronic pain management with mental health. ([Filing No. 43-1 at CM/ECF p. 170](#).)

133.    On August 31, 2018, medical gave Plaintiff a medical equipment pass for a wrist brace. ([Filing No. 43-1 at CM/ECF p. 171](#).)

134.    On September 10, 2018, P.A. Danaher met with Plaintiff to discuss his September 7, 2018 IIR requesting support stockings to help with his neuropathy. ([Filing No. 43-1 at CM/ECF p. 172](#).) Because there were no contraindications for Thrombo-Embolic Deterrent (TED) stockings, and because Plaintiff believed it would be beneficial for his neuropathy, P.A. Danaher agreed to prescribe the stockings. ([Filing No. 43-1 at CM/ECF pp. 172-73](#).) P.A. Danaher instructed Plaintiff on the TED stocking application and use. ([Filing No. 43-1 at CM/ECF p. 172](#).)

135.    On October 17, 2018, Dr. Kasselman saw Plaintiff at the pain clinic. ([Filing No. 43-1 at CM/ECF p. 174](#).) Dr. Kasselman ordered Plaintiff's prescription for Ibuprofen be increased to 800 mg. ([Filing No. 43-1 at CM/ECF p. 174](#).)

136.    On October 30, 2018, while walking down a hallway at LCC, P.A. Danaher looked out a window to the internal exercise yard where he saw Plaintiff doing hyper extension sit-ups at the sit-up station. ([Filing No. 43-1 at CM/ECF p. 175](#).) Plaintiff did at least five sit-ups without evidence of distress. ([Filing No. 43-1 at CM/ECF p. 175](#).) P.A. Danaher then saw Plaintiff do full body arm lifts at a separate station. ([Filing No. 43-1 at CM/ECF p. 175](#).) Plaintiff did five body lifts then moved back to the sit-up station where Plaintiff did at least five more hyperextension sit-ups without distress. ([Filing No. 43-1 at CM/ECF p. 175](#).)

137.    On November 5, 2018, Plaintiff failed to attend his scheduled medical appointment. ([Filing No. 43-1 at CM/ECF p. 176](#).)

138.    On November 18, 2018, P.A. Danaher confronted Plaintiff during a medical appointment about seeing Plaintiff exercising on the weight yard doing hyperextension sit-ups and body lifts. (Filing No. 43-1 at CM/ECF pp. 176, 177.) Plaintiff did not deny doing the exercises and explained he was trying to increase exercise to lower his sugar levels. (Filing No. 43-1 at CM/ECF pp. 176, 177.) P.A. Danaher explained to Plaintiff he was concerned about Plaintiff's pain complaints while he was engaging in activities that aggravated his problems, and Plaintiff replied, "I know." (Filing No. 43-1 at CM/ECF pp. 177-78.)

139.    On November 19, 2018, Plaintiff was seen in the exercise yard doing butterfly and upper-body workouts with heavy weights without evidence of distress. (Filing No. 43-1 at CM/ECF p. 179.)

140.    On March 6, 2019, Plaintiff underwent surgery to address septal deviation and sinusitis. (Filing No. 43-1 at CM/ECF p. 180.)

141.    On March 7, 2019, Plaintiff received a Medical Limited Activity pass which restricted physical exertion, standing for periods longer than 10 minutes, lifting anything greater than 0 pounds, bending or stooping, participating in contact or non-contact sports (including weightlifting, basketball, and handball), heavy lifting, and vigorous activities for two weeks. (Filing No. 43-1 at CM/ECF p. 181.)

142.    On March 18, 2019, Plaintiff was seen by multiple NDCS staff, including P.A. Danaher, in the exercise yard engaging in strenuous exercises, including doing butterfly-type repetitions on a weight machine with fairly heavy weights with a spotter assisting him, doing twenty repetitions at a time on the bench press machine for approximately twenty minutes, and doing approximately ten repetitions at a time of push-ups/burpees. (Filing No. 43-1 at CM/ECF pp. 183-86, 190.) Plaintiff did not appear in any pain or distress while doing these exercises. (Filing No. 43-1 at CM/ECF pp. 183-86, 190.)

143.    On March 19, 2019, Plaintiff was seen in the exercise yard lifting weights on the leg press machine doing approximately 10-15 repetitions at a time. (Filing No. 43-1 at CM/ECF pp. 186-88.) Plaintiff was also using a weight machine which caused him to bend and twist using his shoulders, back, and arms. (Filing No. 43-1 at CM/ECF pp. 186-88.) Plaintiff was seen doing this with full range of motion without any difficulty. (Filing No. 43-1 at CM/ECF pp. 186-88.)

144.    On March 21, 2019, P.A. Danaher watched Plaintiff in the exercise yard doing multiple repetitions on weight machines with a fairly large amount of weight. (Filing No. 43-1 at CM/ECF p. 190.) After he completed his repetitions, Plaintiff jumped up and walked around briskly without any distress. (Filing No. 43-1 at CM/ECF p. 190.)

145.    On March 22, 2019, P.A. Danaher saw from the medical clinic window Plaintiff engaging in weightlifting with multiple repetitions on an arm machine. (Filing No. 43-1 at CM/ECF p. 191.)

146.    On April 5, 2019, Plaintiff failed to show for his scheduled medical appointment. (Filing No. 43-1 at CM/ECF p. 191.) P.A. Danaher observed Plaintiff in the exercise yard lifting weights during the time he was scheduled for his appointment. (Filing No. 43-1 at CM/ECF p. 191.)

147.    On April 12, 2019, P.A. Danaher met with Plaintiff for a medical appointment regarding pain from (1) ganglions in wrist, (2) fracture in T11, and (3) neuropathy in feet. (Filing No. 43-1 at CM/ECF p. 192.) Plaintiff walked in and sat down in the exam room without apparent distress. (Filing No. 43-1 at CM/ECF p. 192.) P.A. Danaher informed Plaintiff that he watched Plaintiff in the exercise yard the previous week doing a strenuous work out without apparent distress from his wrists, back, or feet. (Filing No. 43-1 at CM/ECF p. 192.) Plaintiff became defensive and stated he "had to exercise for his diabetes." (Filing No. 43-1 at CM/ECF p. 192.) P.A. Danaher explained to Plaintiff that what he witnessed was "bodybuilding, exercising very strenuously which [was] totally contradictory to his health and

extremely detrimental to the health issues he [was] complaining about." ([Filing No. 43-1 at CM/ECF p. 192](#).) P.A. Danaher informed Plaintiff that he had multiple incident reports that Plaintiff jogs and lifts weights in the gym and was on a volleyball team. ([Filing No. 43-1 at CM/ECF p. 192](#).) P.A. Danaher told Plaintiff that he would not change his current medications and the best treatment plan is to restrict his activity—meaning no gym, no yard, no weightlifting. ([Filing No. 43-1 at CM/ECF p. 192](#).) Plaintiff became argumentative and again reiterated he had to exercise for his diabetes. ([Filing No. 43-1 at CM/ECF p. 193](#).) P.A. Danaher explained to Plaintiff that bodybuilding was not the proper exercise. ([Filing No. 43-1 at CM/ECF p. 193](#).) Plaintiff confirmed to P.A. Danaher that he was not willing to change his exercise routine. ([Filing No. 43-1 at CM/ECF p. 193](#).) Plaintiff then asked if P.A. Danaher would send him to a specialist for his ganglions and foot pain. ([Filing No. 43-1 at CM/ECF p. 193](#).) P.A. Danaher responded that it was not clinically indicated and that he needed to stop such strenuous exercises, volleyball, and other sports so that his pain would improve. ([Filing No. 43-1 at CM/ECF p. 193](#).) Plaintiff left the exam room without any apparent distress. ([Filing No. 43-1 at CM/ECF p. 193](#).)

### III.  STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." [Fed. R. Civ. P. 56(a)](#). The movant bears the initial responsibility of informing the court of the basis for the motion and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.

*Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis County*, 653 F.3d 745, 751 (8th Cir. 2011).

The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

## IV. DISCUSSION

### A. Deliberate Indifference to Serious Medical Needs

To prevail on an Eighth Amendment claim, Plaintiff must prove that Defendants acted with deliberate indifference to his serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). The deliberate-indifference standard includes both an objective and a subjective component. Plaintiff must demonstrate that (1) he suffered from objectively serious medical needs, and (2) Defendants knew of, but deliberately disregarded, those needs. *See Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) (quoting *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)).

"For a claim of deliberate indifference, 'the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" *Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 499 (8th Cir. 2008) (quoting *Estate of Rosenberg v.*

*Crandell*, 56 F.3d 35, 37 (8th Cir. 1995)); *see also Bender v. Regier*, 385 F.3d 1133, 1137 (8th Cir. 2004) (a prisoner's mere disagreement with the course of his medical treatment fails to state a claim against a prison physician for deliberate indifference under the Eighth Amendment). Indeed, "[e]stablishing the subjective component of a deliberate indifference claim requires showing 'a mental state akin to criminal recklessness.'" *Ryan v. Armstrong*, 850 F.3d 419, 425 (8th Cir. 2017) (quoting *Thompson v. King*, 730 F.3d 742, 746–47 (8th Cir. 2013)).

"The plaintiff-inmate must clear a substantial evidentiary threshold to show that the prison's medical staff deliberately disregarded the inmate's needs by administering an inadequate treatment." *Meuir v. Greene Cnty. Jail Emps.*, 487 F.3d 1115, 1118 (8th Cir. 2007). The Eighth Circuit has held that prison medical professionals do not act with deliberate indifference where they do not ignore a prisoner's complaints but exercise independent medical judgment and attempt to treat them in a manner other than the precise manner the prisoner requests. *See Allard v. Baldwin*, 779 F.3d 768, 772 (8th Cir. 2015) (granting summary judgment to medical defendants who did not ignore inmate's complaints, but saw inmate on several occasions and tried numerous treatments); *Logan v. Clarke*, 119 F.3d 647, 649-50 (8th Cir. 1997) (prison doctors were not deliberately indifferent where they treated prisoner on numerous occasions and offered sensible medication and treatment).

The court finds that the undisputed material facts demonstrate that Defendants were not deliberately indifferent to any serious medical needs of Plaintiff. To the contrary, the facts show that from the time Plaintiff entered NDCS custody in March 2014 through the end of the time period under consideration, NDCS expended significant resources in attempting to get to the root of Plaintiff's chronic pain. He was seen within NDCS a countless number of times by NDCS medical staff, including P.A. Danaher, Dr. Hustad, and Dr. Kasselman. Plaintiff was referred on several separate occasions to outside specialists, including orthopedic surgeons and neurological and spinal surgeons for further evaluations and surgical consultations. Plaintiff also was seen by Dr. Kasselman at the NDCS pain clinic. Numerous

diagnostic tests were run, including a number of X-rays and MRIs. Plaintiff has been prescribed physical therapy, over-the-counter arch support insoles, special ordered shoes, custom molded orthotics, TENS unit with wires and electrodes, and thrombosis stockings to help alleviate his pain. In addition, while Plaintiff has been in NDCS custody, the medical records indicate that Plaintiff was prescribed or offered various medications for pain control, including Flexeril (cyclobenzaprine), Tramadol, Gabapentin, Methocarbamol, Indomethacin, Naproxen, Ketorolac, Amitriptyline, Meloxicam, Topamax, Pyriodoxine, Duloxetine, Mobic, Indocin, Robaxin, B12 shots, and other anti-inflammatory medications. (Filing No. 43-5 at CM/ECF p. at 2, ¶ 4.)

At least on a gross basis, this hardly smacks of deliberate indifference.

Plaintiff complains, however, that Defendants acted with deliberate indifference when they prescribed Gabapentin for his pain, rather than Lyrica as was recommended by an outside specialist, and when they tapered off and then discontinued his prescription pain medication. Plaintiff further claims that, although he was back on Gabapentin as of July 31, 2018, he is still in extreme pain and medical is refusing to provide necessary medical treatment.

With respect to Plaintiff's complaint that Defendants acted with deliberate indifference when they did not prescribe him the specific pain medication recommended by an outside specialist, the court disagrees. The record reflects that, on August 7, 2017, an outside orthopedic specialist indicated that Plaintiff was currently taking Gabapentin 300 mg and recommended that Plaintiff be prescribed Lyrica *or* that his Gabapentin dosage be increased. Specifically, the provider noted: "I would encourage [Plaintiff] to talk to the medical personnel there about possibly switching him from [G]abapentin to Lyrica *or if possible increase the dose of his Gabapentin*" for his foot pain. (Filing No. 43-1 at CM/ECF p. 109 (emphasis added).) On August 28, 2017, P.A. Danaher saw Plaintiff and noted the specialist's recommendation and that Plaintiff was currently taking Gabapentin 1200 mg three times a day (3600 mg total) in addition to Tramadol. Thus, the record indicates that

Plaintiff's Gabapentin prescription either had been increased per the specialist's recommendation or was already at a higher dosage than what the specialist indicated. Moreover, the decisions by P.A. Danaher, Dr. Hustad, and Dr. Kasselman not to prescribe Lyrica were no more than mere disagreements with the course of treatment prescribed, and not deliberate indifference. *See Bender*, 385 F.3d at 1137.

The undisputed facts further establish that the decisions and recommendations of P.A. Danaher, Dr. Hustad, and Dr. Kasselman regarding Plaintiff's pain management, including tapering off and discontinuing Plaintiff's prescription pain medications, were clearly based on their independent medical judgment. *See Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996) ("[N]othing in the Eighth Amendment prevents prison doctors from exercising their independent medical judgment."). Specifically, the summary judgment record shows that, in addition to reporting minimal benefit from the pain medication, Plaintiff's description of pain did not correlate to objective medical evidence or to Plaintiff's level of physical mobility and activity. (*See generally* Filing No. 43-1; Filing No. 43-4 (Declaration of Dr. Kasselman); Filing No. 43-5 (Declaration of P.A. Danaher).) P.A. Danaher and Dr. Kasselman submitted declarations that elucidate the rationale of their treatment decisions.

P.A. Danaher stated that his "medical decisions regarding how to treat [Plaintiff]" have "always been informed by" (1) subjective factors, such as the symptoms Plaintiff reported, and (2) objective factors, such as the results of X-rays, MRIs, and physical examinations, Plaintiff's medical history, and P.A. Danaher's observations of Plaintiff's mobility and "apparent distress—or lack thereof—when engaging in physical activity." (Filing No. 43-5 at CM/ECF at p. 3, ¶ 5.) P.A. Danaher further explained that Plaintiff's ability to play handball and volleyball, "aggressively lift[] weights," perform "body exercises on the machines," and jog was "not consistent with his physical complaints." (Filing No. 43-5 at CM/ECF at p. 4, ¶ 8.) Based on Plaintiff's physical activities, "objective findings on physical examinations," and Plaintiff's reports of "minimal benefit" from Tramadol and Gabapentin, P.A. Danaher determined that continuation of these prescriptions was

not indicated and that Plaintiff should try "alternate means of treatment." ([Filing No. 43-5 at CM/ECF at p. 3](#), ¶ 5.) P.A. Danaher also decided that trigger point injections should not be used until Plaintiff "cooperated with limiting his activities," because he could be further injured if he continued his physical activities after the injections. ([Filing No. 43-5 at CM/ECF at p. 4](#), ¶ 9.)

Similarly, Dr. Kasselman, who saw Plaintiff at the pain clinic but was not Plaintiff's primary health care provider and could only make suggestions as to his treatment, ([filing no. 43-4 at CM/ECF p. 3](#), ¶ 10), stated that when he examined Plaintiff, he "could not find any sources of his '10/10' reported pain" ([filing no. 43-4 at CM/ECF p. 3](#), ¶ 8). Dr. Kasselman explained that Plaintiff "refused the solutions offered, but requested Gabapentin, Lyrica, or other narcotics, none of which [were] appropriate for the type of pain that [Plaintiff] was describing to [him]." ([Filing No. 43-4 at CM/ECF p. 3](#), ¶ 8.) Specifically, Dr. Kasselman opined that Plaintiff's back pain and arthritis-type wrist pain could be resolved by an "over the counter analgesic" and that Gabapentin was not "appropriate" to address such pain. ([Filing No. 43-4 at CM/ECF p. 2](#), ¶¶ 5, 6.) Indeed, when Dr. Kasselman first met Plaintiff, "he was on high doses of Tramadol and Gabapentin" but "reported very little benefit from those medications." ([Filing No. 43-4 at CM/ECF p. 2](#), ¶ 4.) Considering these factors, Dr. Kasselman recommended that Plaintiff discontinue "his very extensive workouts on the weight pile as well as handball and other high-intensity sports," which could exacerbate his pain, and that Plaintiff begin a "more gentle exercise program that consisted of brisk walking, stretching, and yoga type of exercise." ([Filing No. 43-4 at CM/ECF pp. 2-3](#), ¶ 7.) Finally, Dr. Kasselman noted that, although trigger point injections can help relax spasming muscles caused by a "bad back" or arthritis in the spine, Plaintiff's failure to follow exercise restrictions makes the injections "far from ideal, and, in fact, could risk further injury." ([Filing No. 43-4 at CM/ECF p. 3](#), ¶ 9.)

Importantly, Plaintiff has not come forward with any evidence to refute the statements in P.A. Danaher's and Dr. Kasselman's declarations that this course of care was medically appropriate. *See Reid v. Griffin*, 808 F.3d 1191, 1193 (8th Cir.

2015) ("In the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that she did not feel she received adequate treatment"); *Nelson v. Shuffman*, 603 F.3d 439, 449 (8th Cir. 2010) (same).

Plaintiff's allegation that P.A. Danaher, Dr. Hustad, and Dr. Kasselman "cut off" or refused to provide him anything for his pain between December 7, 2017 and July 24, 2018 is inaccurate; although Plaintiff was not prescribed Gabapentin during this time, he was prescribed and offered other medications to alleviate his pain. (*See generally* Filing No. 43-1.) *See Fourte v. Faulkner Cnty.*, 746 F.3d 384, 390 (8th Cir. 2014) (finding no deliberate indifference when medical providers "made efforts to cure the problem in a reasonable and sensible manner"). That Plaintiff was not prescribed the pain narcotic of his choice is of no consequence. Plaintiff does not have a constitutional right to a particular type of pain medication, and P.A. Danaher, Dr. Hustad, and Dr. Kasselman did not violate the Eighth Amendment when, in the exercise of their professional judgment, they refused to implement Plaintiff's requested course of treatment and instead prescribed and offered numerous alternative pain medications and treatments. *See Allard*, 779 F.3d at 772; *Logan*, 119 F.3d at 649-50; *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996). There is no evidence that Plaintiff's pain complaints were ever ignored or that he was ever without some type medication or treatment to help alleviate his pain. Furthermore, the summary judgment record indicates that, since the filing of this lawsuit and during the pendency of this Motion, Plaintiff has been placed back on Gabapentin and has received medical attention and treatment. (Filing No. 15; Filing No. 43-1.) Plaintiff claims, however, that he is still in pain. Any alleged failure to fully alleviate Plaintiff's pain or cure his injuries does not rise to the level of deliberate indifference. *See Logan*, 119 F.3d at 649-50 (finding no deliberate indifference when prison doctors treated the prisoner on "numerous occasions" and "made efforts to cure the problem in a reasonable and sensible manner").

In sum, the record clearly shows that P.A. Danaher, Dr. Hustad, and Dr. Kasselman continually and persistently addressed Plaintiff's pain complaints and

prescribed and offered various pain medications and pain management strategies. There is simply no evidence that they declined to provide the medication Plaintiff desired, or tapered and discontinued medication, because they wanted to punish him or because they were apathetic about his well-being. Rather, they did so because, in their medical judgment, it was in Plaintiff's best interest. The conduct of P.A. Danaher, Dr. Hustad, and Dr. Kasselman hardly rises to the level of criminal recklessness necessary to establish deliberate indifference. *See Ryan*, 850 F.3d at 425. To the contrary, the record establishes treatment of, not deliberate indifference to, Plaintiff's medical conditions.

## B. Respondeat Superior Liability

Plaintiff also claims that Dr. Deol, the NDCS Medical Director, was deliberately indifferent to Plaintiff's medical needs and "knew or should have known" about Plaintiff's medical needs and lack of treatment because "he oversees all of the Department of Medical and is the one whom approves all Medical procedures and treatments being done to any prison inmate . . . and is the one whom told all his staff to make cuts in spending and to stop treating some things." (Filing No. 1 at CM/ECF p. 5; Filing No. 21 at CM/ECF p. 5, ¶ 28.)

"It is well settled that § 1983 does not impose respondeat superior liability." *Hughes v. Stottlemyre*, 454 F.3d 791, 798 (8th Cir. 2006) (internal quotation marks omitted). To state a § 1983 claim, the plaintiff must allege that the defendant was personally involved in or had direct responsibility for incidents that resulted in injury. *Martin v. Sargent*, 780 F.2d 1334, 1338 (8th Cir. 1985). "Supervisors can, however, 'incur liability . . . for their personal involvement in a constitutional violation, or when their corrective inaction amounts to deliberate indifference to or tacit authorization of violative practices.'" *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010) (quoting *Choate v. Lockhart*, 7 F.3d 1370, 1376 (8th Cir. 1993)).

Although Dr. Deol, as the Deputy Medical Director for NDCS, oversees all aspects of healthcare within NDCS, it is undisputed that he is not (and never was)

Plaintiff's treating physician or involved in the actual assessment and diagnosis of Plaintiff's medical needs. (Filing No. 43-3 at CM/ECF pp. 1-2, ¶¶ 2, 5-6 (Declaration of Dr. Deol).) That Plaintiff has complained to Dr. Deol about not receiving the pain medication he desires does not establish that Dr. Deol had direct involvement in Plaintiff's treatment decisions. Additionally, Plaintiff's allegation that Dr. Deol "told all his staff to make cuts in spending and to stop treating some things" (filing no. 21 at CM/ECF p. 5, ¶ 28) is incredible and not supported by any evidence. The record shows that in March 2017, a few months after Dr. Deol was appointed Director of Medical Services for NDCS, he "began encouraging a policy to review the diagnoses of inmates receiving prescription medications that are prone to abuse in an effort to verify an inmate's need for such medications." (Filing No. 43-3 at CM/ECF pp. 1-2, ¶ 3.) But Dr. Deol has "never told medical staff to stop treating inmates for medical issues they are experiencing." (Filing No. 43-3 at CM/ECF p. 2, ¶ 4.) Moreover, there is no indication that Dr. Doel, in his capacity as the Deputy Medical Director of Health Services for NDCS, needs to take "corrective action" for constitutional violations here because there are no predicate violations to correct in the first place. *See Choate*, 7 F.3d at 1376. As set forth above, Plaintiff cannot show that his treating physicians—P.A. Danaher, Dr. Hustad and Dr. Kasselman—acted with deliberate indifference when they declined to provide the pain medication Plaintiff desired or when they tapered off or discontinued Plaintiff's prescribed medication.

Thus, the court finds that the evidence fails to establish that Dr. Deol acted with deliberate indifference.

## C. Injunctive Relief

Because the court has concluded that the individual Defendants were not deliberately indifferent to Plaintiff's medical needs, no constitutional violations have occurred and there is no underlying wrong for which Defendants could be enjoined. *See Falls v. Nesbitt*, 966 F.2d 375, 380 (8th Cir. 1992) ("We have no Constitutional violation; therefore, the use of an injunction is unnecessary since the conduct sought to be enjoined no longer represents a claim which violates the Eighth Amendment.").

IT IS THEREFORE ORDERED that:

1. Defendants' Motion for Summary Judgment (filing no. 42) is granted.

2. A separate judgment will be entered.

Dated this 1st day of November, 2019.

BY THE COURT:

s/ *Richard G. Kopf*
Senior United States District Judge